UTICA,
October, 1822.

JACKSON
v.
WHITE.

JACKSON, ex dem. RUSSELL, against WHITE.

EJECTMENT for lot No. 41., in the north-east quarter of the town of *Columbus*, in the county of *Chenango*, tried before Mr. Justice *Van Ness*, at the *Chenango* circuit, in *June*, 1821.

The plaintiff gave in evidence letters patent, dated *May* 27th, 1791, to *Robert Edmonston*, for the north-east quarter of the seventeenth township on the *Unadilla* river, (now the town of *Columbus*.)

*J. Aitcheson*, a witness for the plaintiff, testified, that he was well acquainted with the family of *Robert Edmonston*, and that he died in *Great Britain*, about the year 1792, leaving three children, *Samuel B.*, *Elizabeth Frances*, (now the wife of *George Riddel*,) and *Andrew*, all of whom were born in *Great Britain*, where they have always resided, except *Andrew*, who came into this state in the year 1811. That *Robert E.*, at the time of his death, left two sisters, *Grace* and *Eleanor*, and one brother, *William*, all of them born in *Great Britain*; and none of them, except *William*, ever resided in this country. That *Grace* died in the lifetime of *William*, without issue; *William* died in *London*, about twenty years ago, and was, at the time of his death, a general in the *British* army; that *Eleanor* is still living. The plaintiff then gave in evidence a deed from *Eleanor E.*, *Samuel B. E.*, *George Riddel*, and *Elizabeth Frances*, his wife, and *Andrew E.*, to the lessor of the plaintiff, dated *April* 27, 1812, for lots 39, 40, 41, 42, and 43, as designated on a map made for the said *William Edmonston*, in *November*, 1796.

*John Frank*, a witness, testified, that he knew *William Edmonston*, who lived on his farm, called *Mount Edmonston*, on the *Unadilla* river, before the revolutionary war;

*W. E. came from England in 1774, and resided in this state, and was an officer in the British army. Having been arrested in 1776, as a person disaffected to the American revolution, he was, in August, or the beginning of September, 1776, a prisoner, on his parole, and remained such prisoner, at Albany, until December or January following, waiting for a passport to join his regiment, when he either joined the British army, or went to England, where he died about the year 1800, being then a general in the British army: Held, that W. E. never became a citizen of this state, after it had thrown off its allegiance to Great Britain, and become a sovereign and independent state; but that he continued a British subject, so that he could not, by reason of his alienage, take lands in this state, by descent, from his brother, who died in 1792.*

Although the Convention of delegates of this state, on the 9th of *July*, 1776, adopted the declaration of independence, and there were committees, or temporary bodies of men who took charge of the public safety, there was no regular organized government, or any executive, legislative, or judicial authority of the state, until the adoption of the Constitution, on the 20th of *April*, 1777.

that in 1776, the witness was a member of the committee of safety, in the town of *German Flatts ;* and the committee, in that year, caused *W. E.*, who was a major in the *British* service, to be arrested, as a disaffected person, and he was sent to *Albany*, where he remained, as the witness was informed, during the ensuing winter ; and the witness believed, that he was arrested after the declaration of independence. Another witness testified, that she saw *William E.*, in the fall of the year 1776, at the *German Flatts ;* that he came there on his way to *Albany.* That she knew the time, as it was after the birth of her eldest child, who was born the 19th of *August*, 1776. Another witness testified, that he saw *William E.*, in *Albany*, the latter end of *August*, or beginning of *September*, 1776, and was informed by him that he had just arrived, and was a prisoner on his parole ; that he again saw *W. E.* in *Albany*, in *December* or *January* following, and was told by him, that he was waiting for a passport to join his regiment. This evidence, as to the residence of *W. E.* in this state, was objected to by the defendant's counsel, but the objection was overruled by the Judge.

A witness, (*Cannon*,) for the defendant, testified, that he passed through *Albany*, in *May* or *June*, 1776, on his way to *Lake George*, and heard that Major *Edmonston* was there, and complained of being made a prisoner ; but he did not see him ; the witness said, that on his way to *Lake George*, he met the *American* troops on their retreat from *Canada.*

The defendant read in evidence an act of the legislature, entitled, " an act for the relief of the children of the late *Robert Edmonston*," passed *March* 29th, 1816 ; and, also, the decision of the Chief Justice and Surveyor General, made in pursuance of the act, by which it was decided, that the defendant was an actual settler on lot No 41., the premises in question, under the said act, and that the children of the said *Robert E.* should convey the said lot to the defendant, on the terms mentioned by that decision, from which it further appeared, that *Andrew Edmonston*, in behalf of the children of *Robert Edmonston*, attended with his counsel, before the Chief Justice and Surveyor General.

This evidence was objected to by the plaintiff's counsel, but admitted by the Judge.

A verdict was taken for the plaintiff, subject to the opinion of the Court, on a case containing the facts above stated, with liberty to either party to turn the same into a special verdict.

*R. Campbell,* for the plaintiff. He contended, 1. That *William Edmonston,* being a freeholder in this state until, and after the 16th of *July,* 1776, owed allegiance to the state, and was a citizen thereof, and had capacity to take and hold lands by descent. On the 16th of *July,* 1776, the convention of the state, whose proceedings are declared by the Constitution to be part of the laws of the land, " resolved, unanimously, that all persons abiding within the state of *New-York,* and deriving protection from the laws of the same, owe allegiance to the said laws, and are members of the state." The case of *M'Ilvaine* v. *Cox,* (2 *Cranch's Rep.* 280. 4 *Cranch's Rep.* 209.) which was similar, in almost every respect, to the present case, is decisive on this point. The acts of the government of this state are equally strong as those of *New-Jersey,* in asserting its claim to the allegiance of those persons who were inhabitants of the state. They are all in perfect accordance with the ordinance of the 16th of *July.*(a) For instance, the declaration or ordinance introduced by Mr. *Jay, May* 10, 1777, and passed unanimously, offered a " free pardon to such of the subjects of this state as, having committed treasonable acts against the same, shall return to their allegiance ;" and

(a) A copy of this ordinance, handed to the Court by the counsel, was as follows: " Resolved, unanimously, that all persons abiding within the state of *New-York,* and deriving protection from the laws of the same, owe allegiance to the said laws, and are members of this state ; and that all persons passing through, visiting, or making a temporary stay in the said state, being entitled to the protection of the laws, during the time of such passage, visitation, or temporary stay, owe, during the same time, allegiance thereto."

" That all persons members of, or owing allegiance to this state, as before described, who shall war against the said state, within the same, or be adherent to the king of *Great Britain,* or others, the enemies of the said state, within the same, giving him or them aid and comfort, are guilty of treason against the state ; and being thereof convicted, shall suffer the pains and penalties of death."

that ordinance recites, that " divers subjects of this state have been seduced from their allegiance to the same, by the acts of subtle and wicked emissaries from the enemy ;" and offers them, on their taking the oath of allegiance, a full and free pardon ; and that they be *restored* to a participation of all the rights and privileges appertaining to the good people of this state.

2. The descent from *William Edmonston*, being after the treaty of 1794, between the *United States* and *Great Britain*, is within the provisions of the *ninth* article of that treaty, and protected by it. It may, perhaps, be objected, that *William Edmonston* could not be an *American* citizen in 1792, and a *British* subject in 1794, and at his death : But there is nothing repugnant or inconsistent in his being both. He was born in *Great Britain*, and after he left this state, he resided in his native country. According to the *English* laws, he owed perpetual allegiance to that country, as a natural born subject ; and if the laws of this country imposed on him a new allegiance, it did not destroy his natural allegiance, while he remained in the *British* dominions, nor prevent his being a *British* subject. If he had the right, before the treaty, which other *British* subjects had not, that cannot take away his right, acquired in common with other *British* subjects, under the treaty. The treaty is a compact between the two nations, and is to be construed according to the understanding of the contracting parties. There can be no doubt, that *William Edmonston* was considered by the *British* government, in 1794, as a *British* subject, for whom provision was made in that treaty. If so, he must be deemed by this Court, a *British* subject, for the purposes contemplated by the contracting parties to the treaty. The decisions of the *English* Courts are in accordance with this doctrine. In *Marryat* v. *Wilson*, (1 *Bos. and Pull.* 430.) the Court of Exchequer Chamber decided, that a natural born *British* subject, who had become a naturalized citizen of this country, either before or after the declaration of Independence, was to be considered as an *American* citizen ; so as to entitle him to the benefits of the provisions of the treaty of 1794, in regard to the trade with the *East Indies*.

*H. Van Der Lyn,* contra, contended, 1. That the premises in question, on the death of *Robert E.,* in 1792, escheated to the state, on account of the alienage of his children. (*Calvin's Case,* 7 *Co.* 25 *a. Jackson* v. *Lunn,* 3 *Johns. Cases,* 109. 120.) There is a distinction, in this respect, between a purchase, and a taking by descent. In case of a purchase, the alien holds until office found : but, where an alien dies seised of land, the law, *quæ nihil frustra,* will not give the land to an alien heir, who cannot keep it. (1 *Ventris,* 417. 1 *Bos. and Pull.* 48. *Fairfax* v. *Hunter's Lessee,* 7 *Cranch,* 603. 621. 7 *Term Rep.* 98.)

2. Admitting *William E.* to have been *antenatus,* or born under a common allegiance, before the *American* revolution, yet it has been settled, that a *British* subject, born before, cannot, since the revolution, take lands by descent in this country. (*Fairfax* v. *Hunter's Lessee,* 7 *Cranch,* 603. 620. *Kelly* v. *Harrison,* 2 *Johns. Cases,* 29. *Dawson* v. *Godfrey,* 4 *Cranch,* 321.)

3. *William E.* cannot be considered as a citizen of this state, in consequence of his being here after the declaration of independence. From the evidence of the witness, *Cannon,* it is most probable, that he was arrested in *May,* 1776 ; but, admitting that his arrest was after the 9th of *July,* yet, being a natural born subject of *Great Britain,* he had a right, at the commencement of the revolution, to dissent from it, and the declaration of independence, and to adhere to his allegiance to the king of *Great Britain ;* and the evidence shows, that he exercised that right, and, therefore, never became a citizen of this state. In *Chapman's* case, decided in the Supreme Court of *Pennsylvania,* in 1781, (1 *Dallas,* 53.) Chief Justice *M‘Kean,* fully recognises this right of the minority, in case of a revolution, or change of government. So, in 1795, in the case of *Caignet* v. *Pettit,* (2 *Dallas,* 234.) the same Court, in the case of a *Frenchman,* admit, that he had an undoubted right to dissent from the revolution, and, as a member of the minority, to refuse his allegiance to the new government, and withdraw from the territory of *France.* The only question is, whether *W. E.* did dissent from the revolution, within a reasonable time, and quit the country. It appears, that as early as *August,*

1776, he was arrested as a dangerous and disaffected person, holding a commission in the *British* army, and was detained, as a prisoner, on his parole, until *December* following, when he was either exchanged as a prisoner of war, or permitted to return to *England*.

4. At the time of *W. E's.* arrest, in 1776, the colony of *New-York* had no government, no executive or legislature, duly constituted by the people; for the constitution of this state was not adopted until *April*, 1777. He, therefore, could not be a subject of the colony. Where there is no government, there can be no allegiance. Every thing, at that time, was in disorder and confusion. The people were *in transitu* from the condition of a colony, to that of an independent state; and, during that period, *New-York* retained the name of a colony. The declaration of independence worked a dissolution of government; the acts of Assembly, and the common and statute law of *England*, were no longer in force, and were not revived until the constitution of the state was adopted. No laws, passed subsequent to the arrest and departure of *W. E.* from the state, could have any operation as to him.

5. Laws of the state, passed as late as 1778 and 1781, recognise the right of the *loyalists* to refuse to become citizens of the state. (1 *Greenl. Ed. Laws*, 22, 43. Sess. 1. ch. 47. Sess. 4. ch. 33.) If, then, *W. E.* had continued in the state, as late as 1781, he would have had the right of electing to continue a subject of the king of *Great Britain*, and of being sent home as a prisoner of war.

6. But, admitting even that *W. E.* was an *American*, at the time of his departure to *England*, we contend, that the premises in question, on his death, in 1801, escheated to the state, and did not descend to his sister and the children of his brother *Robert*, by reason of their alienage. In answer to this objection, the plaintiff relies on the 9th article of the treaty of 1794, between *Great Britain* and the *United States*. But that treaty was intended to secure *British* subjects, holding lands in the *United States*, from the consequences of *alienage*, and to enable them to sell, grant, and devise the same, as if they were native *American* citizens. *American* citizens did not require the protection of an article

of the treaty, to remove the obstacle of alienage, which, as to them, did not exist, and invest them with the rights of native citizens, which they already possessed. If, therefore, *W. E.* acquired a title to the premises in question, by descent, on the death of his brother *Robert*, in 1792, and the treaty of 1794 had never been made, he would have continued to hold the lands, as a native citizen, until his death. The 9th article of the treaty has, then, no application to the case of *American* citizens. And, if *W. E.* did, in truth, hold the premises in question, at the date of the treaty of 1794, as a native *American* citizen, according to the laws of this state, he could not, at the same time, have held them as an alien, and subject of *Great Britain.* While a person in the *United States* is regarded as a citizen, he never can cease to be so regarded, until he has expatriated himself, and become the subject of another government. (*Fish* v. *Stoughton,* 2 *Johns. Cases,* 407.)

Again, the dissolution of the *British* government in *America,* and the erection of a new and independent government, absolved all the citizens of the new government from their allegiance to *Great Britain ;* and by the treaty of peace of 1783, *Great Britain* recognised the independence of the *United States,* and of all its citizens, among whom *W. E.* would be, of course, included. (3 *Dallas,* 224. 1 *Bac. Abr.* 129. 1 *Woodes.* 382.) If *W. E.* therefore, be considered as a citizen of *New-York,* he was absolved by the *British* government from his natural allegiance to that government, and could not, without some act of denization or naturalization, become again a subject of *Great Britain.*

The treaty of 1794, does not determine who were *British* subjects, or *American* citizens, but leaves that question to be determined by the laws of the respective governments. (4 *Cranch,* 214.) It would be strange that a native *American* citizen should be considered, in an *American* Court, as holding lands in the *United States,* not as a citizen of his own country, but as a subject of *Great Britain :* for he must be considered as holding the land as a *British* subject, before the 9th article of the treaty can be made applicable to his case. Those *British* subjects who held lands in the *United States,* as *aliens,* were, by the 9th article of the treaty, to be

UTICA,
October, 1822.

JACKSON
v.
WHITE.

considered as native citizens, *so far only* as respected those lands, and the legal remedies incident thereto ; but in all other respects, they continued aliens. If *W. E.* at the date of the treaty was an *American* citizen, he must, notwithstanding that treaty, be considered as holding his lands as an *American* citizen. (*Jackson, ex dem. Folliard and another*, v. *Wright*, 4 *Johns. Rep.* 75. 79.)

The case of *Marryat* v. *Wilson*, (1 *Bos. & Pull.* 442. S. C. 8 *Term Rep.* 31.) has been cited by the plaintiff's counsel, to show that a natural born *British* subject, who has become an *American* citizen, is considered in *England*, in regard to their navigation laws, as an *American* citizen. That case, however, supports the position for which we contend, that an expatriated subject, who has become the subject of another state, is to be, thereafter, regarded in his native state as the subject of his adopted country. England, notwithstanding her feudal maxim, *nemo patriam in qua natus est exuere, nec legentiæ debitum ejurare, possit*, is in the habit of violating that maxim, and of adopting the natural born subjects of other countries. Chief Justice *Eyre* might well put into the mouth of the *Englishman*, to say, " I violated no law of my parent state, in procuring myself to be received a subject in the *United States*. She encourages the practice, for she herself adopts the subjects of other states. Why then are the fruits of my adoption to be withheld from me ?" Besides, it has been shown, that the independence of the *United States* absolved all its citizens from their former allegiance as natural born subjects of *Great Britain ;* and consequently, *W. E.* if he became a citizen of this state, by the declaration of independence, could not thereafter be considered a subject of *Great Britain*, by reason of his birth in *England*. It was, therefore, out of the power of *Great Britain*, at the date of the treaty of 1794, to claim *W. E.* as a subject, after having ratified and confirmed, by the treaty of 1783, the independence of the *United States*. Chief Justice *Eyre*, in *Marryat* v. *Wilson*, says, " By the way, I do not understand upon what ground the case of *Butler* was distinguished from *Collet's* case, unless it be that *Butler* has been expressly discharged from his allegiance by act of parliament, in consequence of our acknow-

ledging the independence of the *United States.*" The facts were, that *Butler* was domiciled in the *United States* before, and *Collet* after the declaration of independence. Most clearly, the *United States* could not, without surrendering their sovereignty and independence, permit any person who became a citizen, at the declaration of independence, to be afterwards claimed by *Great Britain* as a subject, on the ground of his having once owed a natural allegiance to that country.

We contend, therefore, that whether *W. E.* was or was not an *American* citizen, the plaintiff is not entitled to recover.

SPENCER, Ch. J. I consider these facts as proved : that *William Edmonston* came from *England* to this state in 1774, at which time he was a major in the *British* service. In 1776, he was arrested by direction of the committee of safety, in the town of *German Flatts*, as a person disaffected to the revolution. In the latter part of *August*, or beginning of *September*, 1776, he was in *Albany*, in consequence of this arrest. He was there as a prisoner on his parole, and remained there until the following winter, waiting for a passport to join his regiment. After that time, we have no further account of him during the revolutionary war ; but the inevitable presumption is, that he joined the *British* forces, or proceeded immediately to *England ;* for there is no proof that he continued to reside in this state, or in any part of the *United States ;* and the evidence is, that he died a general in the *British* army.

The lessor of the plaintiff does not claim to have derived title under the children of *Robert Edmonston,* as his heirs, but claims that *William Edmonston* was a citizen of this state, and took by descent, the real estate of his brother *Robert,* as his heir ; and that on the death of *William,* it descended to his sister *Eleanor,* and to his nephews and niece, the children of *Robert.* It becomes, then, unnecessary to consider the effect of the act of the 29th of *March,* 1816, and the decision of the Chief Justice and Surveyor General under it.

It is not pretended that the children of *Robert Edmonston*

UTICA,
October, 1822.

JACKSON
v.
WHITE.

could take the lands whereof he died seised, by descent, and as his heirs. They were aliens, and he died in 1792; so that the 9th article of the treaty between the *United States* and *Great Britain*, of 1794, does not apply to their case. The question, then, which I propose to examine, is, whether *William Edmonston* became a citizen of this state, after it had thrown off its allegiance to *Great Britain*, and became a distinct and independent sovereignty.

We are called upon to discuss and decide this question, as a mere matter of private right, when all the feelings and passions incident to so mighty a revolution, have subsided. I think it cannot be doubted, that when a people, from a sense of the viciousness of a government under which they have lived, are driven to the necessity of redressing themselves, by throwing off the allegiance which they owed to that government, and in its stead, erecting a new and independent one of their own, that such of the members of the old government only, will become members of the new, as choose voluntarily to submit to it. Every member of the old government must have the right to decide for himself, whether he will continue with a society which has so fundamentally changed its condition. For, having been incorporated with a society under a form of government which was approved, no one can be required to adhere to that society, when it has materially and radically changed its Constitution. Every member submitted to the society as it was, and owed obedience to it, while it remained the same political society. When it divests itself of that quality, by an entire new institution of government, it cuts the knot which united its members, and discharges them from their former obligations. (*Vattel*, b. 1. ch. 3. s. 33., and ch. 16. s. 195. *Puffendorf*, 639.) These principles were expounded by Ch. J. *M'Kean*, in a very satisfactory manner, in *Chapman's* case. (1 *Dallas's Rep.* 58.) He observed, that in civil wars, every man chooses his party; but that all the writers agree, that the minority have individually an unrestrainable right to remove with their property into another country; that a reasonable time for that purpose ought to be allowed; and, in short, that none are subjects of the adopted government, but those who have freely assented

to it. The cases mentioned by the writers on the laws of nature and nations, are not precisely analogous with the condition of the *American* provinces, at the commencement of our revolutionary contest. Ours was a civil war; in the event of failure it would have been regarded as a rebellion; it terminated prosperously and gloriously, and became a revolution. But, that there was an entire dissolution of the government, under which we lived as provinces, owing allegiance to the *British* crown; and that a new form of government, and a new organization of the political society took place, cannot be denied; and hence the case occurred in which every member of the old society had a right to determine upon adhering to his old allegiance, and withdraw himself; or to abide among us, and thus tacitly, or expressly, yielding his assent to the change, and becoming a member of the new society.

It is to be observed, that although the declaration of independence was made by Congress, on the 4th of *July*, 1776, and although the Convention of delegates of this state adopted that declaration on the 9th of the same month, and although we had committees, and temporary bodies of men, who took charge of the public safety, we had no executive, legislative, or judicial authority, nor any organized government, until the 20th of *April*, 1777. It would be a very grave question, which I shall avoid discussing, whether, until the adoption of our Constitution, treason could be committed against that imperfect and inchoate government which was called into existence by the necessity of the case, and was continued until the people could deliberate and settle down upon a plan of government calculated to secure, and perpetuate their liberties. But the question is, whether Major *Edmonston*, being in this state at the very commencement of that revolutionary struggle, holding a commission in the army of the *British* king, and being taken up, within one or two months after the declaration of independence, put on his parole, and finally sent out of the country as a dangerous and disaffected man, prior to the institution of any regular form of government, can be said to have renounced the former government, and to have become a mem-

ber of the new society, and ever afterwards to have retained the rights, duties, and privileges of an *American* citizen.

I cannot bring my mind to doubt on this question; and to me it appears most clearly, that Major *Edmonston* never did acquire the character of a citizen of this state. In *Chapman's* case, Ch. J. *M'Kean* said, that when the word *subject*, instead of *inhabitant*, is used, it meant a subjection to some sovereign power; it refers to one who owes obedience to the laws, and is entitled to partake of the elections into public office; and he observed, that if there were no laws to be obeyed, the prisoner could not be deemed a subject of the state of *Pennsylvania*. It has been decided by the Supreme Court of the *United States*, (4 *Cranch's Rep.* 321.) that a subject of *Great Britain*, born before the declaration of independence, who was never in the *United States*, cannot take lands in this country by descent from a citizen. In *Kelly* v. *Harrison*, (2 *Johns. Cases*, 30.) it was decided, that although the division of an empire worked no forfeiture of a right previously acquired, and, as a consequence, all the citizens of the *United States* who were born prior to our independence, and under the allegiance of the king of *Great Britain*, would still be entitled there to the rights of *British* subjects; yet the rule would not apply *e converso*, and *British* subjects have not, with us, the privileges of citizens; and for this reason, that the sovereignty of the *United States* was created by the act of independence, and there could be no previous right acquired in respect to it, and, consequently, none to lose; nor could it include any other than residents, at the time, within the jurisdiction of the state; and that, therefore, the demandant, who was the widow of *Kelly*, prosecuting for her dower in lands acquired by her husband after the declaration of independence, who had been married to *Kelly* before the revolution, but who remained in *Ireland* during, and after it, he having resided here, and become a citizen, was held not to be endowable of such after acquired lands. This decision fully sanctions the principle, that there must, even in the case of a *feme covert*, be some personal act, indicative of an assent to become a member of the new government, and without it, the rights of citizenship are not acquired. Re-

UTICA,
October, 1822.

JACKSON
v.
WHITE.

sidence here, after the organization of the government, would generally authorize the presumption of assent; for it would be evidence of a union with the new society. When, however, we find a person holding a military office under the regal government, arrested by those who were zealously engaged in effecting a division of the empire, and in rearing a new government, for his disaffection to that new government, so soon after the declaration of independence; and when we find him a prisoner for that cause, and immediately thereafter departing out of the jurisdiction of the new government, and in all human probability, taking part, and bearing arms against its independence; and, finally, when we consider, that his arrest and departure took place before the institution of a regular government in any of its departments, it appears manifest to me, that he cannot be considered as having thrown off his allegiance to the former government, and that, consequently, he never became a member of the new government, but remained a *British* subject.

The plaintiff's counsel has referred us to an ordinance of the Convention of this state, of the 16th of *July*, 1776, which, he supposes, recognises persons in the situation of Major *Edmonston*, as citizens. It resolves, " that all persons, *abiding* within the state of *New-York*, and deriving protection from the laws of the same, owe allegiance to the said laws, and are members of the state; and that all persons passing through, visiting, *or making a temporary stay* in the said state, being entitled to the protection of the laws, during the time of such passage, visitation, *or temporary stay*, owe, during the same time, allegiance thereto; and that all persons, members of, or owing allegiance to this state, as before described, who shall levy war against the said state, within the same, or be adherent to the king of *Great Britain*, or others, the enemies of said state, giving to him or them aid and comfort, are guilty of treason against the state; and, being thereof convicted, shall suffer the pains and penalties of death."

This ordinance takes the distinction between such persons as were abiding within the state, and, as such, deriving protection from, and owing allegiance to the laws, and thereby

becoming members of the state ; and such as were passing through, visiting, or making a temporary stay within the state. The former class, those who were abiding here, were considered by the Convention as citizens ; but the latter class were considered as owing a mere temporary allegiance, which terminated with their departure from the state. The resolution distinctly admits, that such persons as were making *a temporary stay,* who did not mean to abide here, but to leave the country as soon as they could, were not members of the new community. This ordinance, then, so far from regarding persons in the situation in which we find Major *Edmonston,* as members of the new government, in my judgment, considers them not to be such members. It will be recollected, as a known historical fact, that in the early part of the contest, the several provinces assumed arms, merely for the redress of grievances, and that there was no idea of erecting independent governments, and throwing off all allegiance to the *British* government, until the period of the declaration of independence by Congress. Residence in this state, prior to that event, imported nothing, as regards the election or determination of such residents, to adhere to the old, or to adopt the new government. The *temporary stay,* mentioned in the resolution of the Convention, passed only twelve days after the declaration of independence by Congress, and within five days after the adoption of the declaration by the Convention of this state, clearly imports, that such persons who were resident here without any intention of permanent residence, were not to be regarded as members of the state; and such was the precise character and situation of Major *Edmonston's* residence. The case of *M'Ilvaine* v. *Coxe's Lessee,* (4 *Cranch,* 209.) has been relied upon, as a strong and decisive authority for the plaintiff. The facts of that case are stated in 2 *Cranch,* 289. The opinion delivered by Mr. Justice *Cushing,* contains no principle at variance with the conclusion to which I have come in this case. It proceeds entirely on the ground, that *Daniel Coxe* remained in *New-Jersey,* not only after she had declared herself a sovereign state, but after laws had been passed, by which he was pronounced to be a member of, and in allegiance to the new government. The

right which *Coxe* had to elect to abandon the *American* cause, and to adhere to his allegiance to the king of *Great Britain*, I understand not to have been doubted by Judge *Cushing*; and he places the decision not only on the continued residence of *Coxe* in *New-Jersey*, until in 1777, but on the legislative acts of that state, at several periods, recognising him as a citizen of the state. That case being essentially different from this, in the important facts of the case, can have no influence in the decision.

The plaintiff's counsel relied, also, on another ordinance or resolution of the Convention of this state, of the 10th of *May*, 1777, offering " a free pardon to such of the subjects of the state as, having committed treasonable acts against the same, shall return to their allegiance." This ordinance leaves the inquiry, who were subjects of the state, open to examination; and I have endeavoured to show, that Major *Edmonston* was not a subject of the state. Besides, this resolution was posterior to the adoption and promulgation of the state constitution; and treasons may have been committed in the interval between the adoption of the constitution and this ordinance. There may, also, have been persons who had, openly and unequivocally, made their election to become members of the new government, and who were afterwards guilty of treasonable acts. When the Convention speak *of subjects of the state*, they speak of those who owed a permanent allegiance to the state as a political body, and had acquired the rights and owed the duties of citizenship; for we perceive, that the same Convention had, on the 16th of *July*, 1776, discriminated, with great accuracy, between an abiding in the state, which produced permanent allegiance, and a temporary stay, which exacted obedience only during such stay.

Having come to the conclusion, that *William Edmonston* never became a citizen of this state, he was incapable, from his alienage, of taking by descent from his brother. This disposes of the cause, and renders it unnecessary to consider the other points raised by the defendant's counsel.

PLATT, J. concurred.

WOODWORTH, J. dissented.

Judgment for the defendant.